LORI J. GUALCO (Bar No. 95232)
Attorney at Law
455 Capitol Mall, Suite 210
Sacramento, CA 95814
Telephone:  (916) 442-6660
Facsimile: (916) 442-0145

Attorney for Defendant, Counter-claimant and
Cross-claimant, ASTA Construction Co., Inc.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RECLAMATION DISTRICT NO. 2116, and WILLIAM P. DEPAOLI, | Case No. 96 CV 1473 FCD/JFM |
| Plaintiff, | **MOTION TO DISMISS** |
| v. | Date:         October 27, 2006 |
| ARCADY OIL COMPANY, et al., | Time:         10:00 a.m. |
| Defendants. | Courtroom:  2 |
| | Judge:        Frank C. Damrell, Jr. |
| AND RELATED COUNTERCLAIMS AND CROSS-CLAIMS | |

**I.**

**INTRODUCTION**

After initially waiting 12 years to bring their case, Plaintiffs allowed their case to remain dormant for another five years with no apparent explanation.  In the interim, Defendants have been prejudiced by the loss of witnesses and evidence needed to defend this action.  Therefore, the Court must dismiss this action for failure to prosecute.  This action is also barred by the doctrine of laches.

**II.**

**STATEMENT OF FACTS**

1.      **The Property**

This case involves a 3.5-acre parcel of land located in the San Joaquin Delta adjacent to the Whiskey Slough on Roberts Island in San Joaquin County, California.  [First Amended Complaint (hereafter "FAC") ¶76.]  The site is a relatively narrow piece of land located between a road and a levee outside of the town of Holt, California ("DePaoli Site").  It is located approximately 7 miles west of Stockton.

The DePaoli Site is the southerly 3.5 acres of a parcel which, as of the early 1960's, was a single 7.5-acre site owned by the Arcady Oil Company ("DePaoli Site").

2.      **1960-1975 – Licensed Dumping Allowed**

Prior to approximately 1960, the DePaoli Site was unreclaimed swamp and overflow land.  The site was reportedly too small for farming and was therefore unused.  The DePaoli Site reportedly became a natural dumpsite for the surrounding farmers and others.  Reports in the files of the Regional Water Quality Control Board indicate that the site was "an open garbage pit in which people threw domestic garbage, oil cans, etc." [Exhibit 2 to Declaration of Gregory C. Brown (hereafter "Gregory C. Brown Dec.")]

On April 21, 1960, the California Regional Water Quality Control Board, Central Valley Region, adopted a resolution authorizing the DePaoli Site to be used for dumping as a licensed

1    Class III facility. The site was also approved by the San Joaquin County Planning Department for

2    the dumping of drilling mud under a use permit on January 9, 1970.  [Exhibit 8 to Gregory C.

3    Brown Dec.]  At this time, Arcady Oil Company was using the site for the dumping of drilling

4    mud and cuttings associated with the drilling of oil and gas wells.  Drilling mud is usually

5    composed of clay which is used in drilling oil wells to bring the dirt and rock cuttings created by

6    the drill bit to the surface.  The clay mud is pumped down the middle of the drill pipe and then

7    returns to the surface on the outside of the pipe carrying the rock and dirt loosened by the drill bit.

8    The dirt and rock is filtered out of the mud and these are referred to as "cuttings".  When the well

9    is completely drilled, the clay mud and cuttings are disposed of.  Unless a hazardous material has

10   been artificially added to the mud or cuttings, these materials are not hazardous.  Rather, they are

11   natural dirt and rock.

12        At the DePaoli Site, the drilling mud and cuttings were being used to benefit the site by

13   raising the ground level of the parcel so that the site could be reclaimed by the owner and used for

14   other purposes.  According to a May 19, 1976 letter from Arcady Oil to the RWQCB describing

15   the mud disposal operation, "[t]he waste mud is in effect nothing more than a land fill operation.

16   When filled it [the site] will have further utility." [Exhibit 1 to Gregory C. Brown Dec.]  This

17   mud disposal was apparently conducted continuously from the late 1960's and throughout the

18   1970's.

19        **3.    1975-1976 – Problems Reported at the Site**

20

21        As early as May of 1975, the DePaoli Site was the subject of concern by the RWQCB.  A

22   memo in the files of that agency dated May 16, 1975 describes the site as "a mess".  [Exhibit 3 to

23   Gregory C. Brown Dec.]  The RWQCB began proceedings to strengthen the waste discharge

24   requirements for the site.  Internal RWQCB memorandum show that the site continued to be used

25   for improper dumping throughout this period.  [Exhibit 4 to Gregory C. Brown Dec.]  A report in

26   the files of the RWQCB indicates that employees of that agency visited the site on March 25,

27   1976.  The report states that there "was evidence of wastes leaving the disposal area and of a

28   recent disposal of oily wastes in the area a short distance off the road.  Fencing and gates which

once enclosed the area have apparently been stolen, and there is nothing to prevent anyone from dumping any kind of waste at the site." [Exhibit 5 to Gregory C. Brown Dec.]  On April 21, 1976, a representative of Arcady Oil Company wrote to the RWQCB and stated that "[w]e are informed that the oily waste referred to is the result of disposal of crankcase oil with permission of the landowner." [Exhibit 6 to Gregory C. Brown Dec.]

A memorandum from a registered sanitarian dated May 3, 1976 indicates that the DePaoli Site had been used "heavily" for the past 1-1/2 years "as indicated by the large area covered with mud and oil." The memorandum also reported that there was a strong petroleum smell noted during the inspection which "smelled like old crankcase oil". [Exhibit 7 to Gregory C. Brown Dec.]

As a result of the numerous problems at the DePaoli Site, a new waste discharge order and set of waste discharge requirements was issued by the RWQCB on July 23, 1976. The order limited the waste which could be disposed of at the site to "nontoxic drilling mud (free of oil, grease, and heavy metals)." The order also required that the "owner of the waste disposal site shall have a continuing responsibility to assure protection of usable waters from the waste discharge, and for correcting any problems that may arise in the future as a result of this waste discharge and water applied to the waste disposal areas during subsequent use of the property for other purposes." [Exhibit 9 to Gregory C. Brown Dec.]

### 4.      1978 - Improper Dumping Continues

On February 10, 1978, a criminal complaint was issued against Arcady Oil Company for the DePaoli Site. The complaint alleged that petroleum was allowed to pass into the waters of the state in violation of Fish and Game Code. [Exhibit 10 to Gregory C. Brown Dec.]

An RWQCB staff engineer inspected the DePaoli Site on February 15, 1978 and noted that "the source of the oil at the mud disposal site is presumably illicit dumping". He also stated that the "site is unattended . . . and is not adequately fenced to prevent dumping by unauthorized persons." [Exhibit 11 to Gregory C. Brown Dec.]

A March 13, 1978 laboratory analysis in the RWQCB files shows that, among other things, the heavy-metal chromium was found at the site.  [Exhibit 12 to Gregory C. Brown Dec.]  A further RWQCB memorandum shows that as of April 1978 the site remained unfenced, contained heavy metals and was not in compliance with RWQCB orders.  [Exhibit 13 to Gregory C. Brown Dec.]

    **5.    1979 – The Plaintiff DePaoli Acquires the Site**

On June 6, 1979, Plaintiff DePaoli purchased approximately thirty-three (33) acres of land near the DePaoli Site.  In addition, in order to qualify for a legal parcel, DePaoli purchased the 3.5-acre parcel referred to here as the DePaoli Site.  At the time he purchased the DePaoli Site, Plaintiff DePaoli agreed to assume the terms and conditions of the lease of the DePaoli Site which had been entered into by the prior owner.  [FAC, ¶81.]  Thus as of 1979, Plaintiff DePaoli became the landlord for the disposal site and profited from the disposal of drilling mud in two ways:  (1) he received direct rental payments from Arcady Oil Company, the operator of the DePaoli Site; and (2) he benefited from having the elevation of the parcel raised to allow future development of the site.

    **6.    1983-1984 – The Plaintiff Continues to Profit from the Site; The Site is Ordered to be Shut Down**

On March 22, 1983, DePaoli filed a petition with the San Joaquin County Board of Supervisors ("Board") for formation of a reclamation district under the California Water Code encompassing the 37 acres of land purchased by him, which included the 3.5-acre DePaoli Site.  On April 19, 1983, the Board issued and filed its resolution and order forming the District.  [FAC, ¶82.]  DePaoli's District is the second Plaintiff in this case.

In October of 1983, Plaintiff DePaoli wrote to Arcady Oil Company and proposed potential modifications to the lease between himself and Arcady Oil Company.  The modifications included extending the life of the dump, extending the lease and discussing anew "the amount of monetary compensation" involved.  [Exhibit 14 to Gregory C. Brown Dec.]

On October 11, 1984, the RWQCB issued a Cleanup and Abatement Order for the DePaoli Site. The order recited that the Site contained "significant amounts of chromium, arsenic, oil, grease, and total dissolved solids" and the Board requested a cleanup plan for the DePaoli Site. The DePaoli Site apparently stopped accepting drilling muds at or slightly before the time of this order. [Exhibit 15 to Gregory C. Brown Dec.]

### 7.    1983-1984 – The Defendants Involvement with the DePaoli Site

Except for SFPP, L.P., the Defendants are all companies which either drilled oil and gas wells in the northern California area or transported mud and cuttings from those wells to the DePaoli Site. However, as alleged in the First Amended Complaint, these Defendants allegedly only disposed of drilling mud and cuttings during the last 12 months of the life of the Arcady dump, from mid-1983 until mid-1984 when the DePaoli Site was shut down. Furthermore, all of the manifests for disposal by the Defendants relied upon by the Plaintiffs in forming their complaint identify the drilling mud and cuttings as **non-hazardous**. In other words, all of the manifests on their face show that the material allegedly contributed to the DePaoli Site by the Defendants (except SFPP, L.P.) complied with the waste discharge requirements for the DePaoli Site and did not contain the hazardous materials now complained of by Plaintiffs. Importantly, as seen above, there is ample evidence that the DePaoli Site already contained significant oil, heavy metals and many other contaminants long before the Defendants disposed of mud at the DePaoli Site during its last few months of its troubled operations. From the time around 1960 when the site first started being used as a local dump, for the next 23 years the site was repeatedly contaminated due to its improper operations and its unfenced and unmanned condition. There is no evidence that any of the current Defendants contributed anything to the site but clean and permitted mud and rock cuttings as indicated on their individual manifests.

### 8.    1984- 1992 - Plaintiff DePaoli is Actively Engaged at the Site

###         But Takes No Action

The DePaoli Site owner, Plaintiff DePaoli, remained actively engaged with the DePaoli

Site in the decade following its closure.  For instance, the RWQCB files show that Plaintiff DePaoli called that agency on several occasions where written notes were kept.  [Exhibit 16 to Gregory C. Brown Dec.]  According to an Order adopted by the RWQCB, Plaintiff DePaoli's lease for the DePaoli Site with Arcady Oil Company expired in November of 1988.  Meanwhile, the RWQCB continued during the period following the closure of the site in 1984 to pursue remediation and cleanup of the DePaoli Site and DePaoli was right in the middle of these discussions.  [Exhibit 20 to Gregory C. Brown Dec.]  In 1989, a representative of Arcady Oil Company wrote to the RWQCB and indicated that Mr. DePaoli was eager to have his property released from RWQCB jurisdiction because he "proposes to fill it with inert material . . . and develop that as a trailer park under San Joaquin County jurisdiction." [Exhibit 17 to Gregory C. Brown Dec.]  Later in 1989, Mr. DePaoli wrote to the RWQCB and expressed his concerns "as the landowner" with respect to the fact of the problem "has continued for several years without resolution."  [Exhibit 18 to Gregory C. Brown Dec.]  In 1990, the RWQCB held a public hearing regarding a new draft Cleanup and Abatement Order for the DePaoli Site.  Notice of that hearing was sent by certified mail to Plaintiff DePaoli. [Exhibit 19 to Gregory C. Brown Dec.] After that hearing in January of 1990, the RWQCB issued a new Cleanup and Abatement Order directed to Arcady Oil Company.  The order contained a remediation timeline requiring a final closure report to be submitted to the RWQCB on or before September 1, 1990.  [Exhibit 20 to Gregory C. Brown Dec.]  On October 22, 1990, the RWQCB sent Arcady Oil Company a notice of violation of the Cleanup and Abatement Order entered in January of the same year.  Plaintiff DePaoli was copied on the notice.  [Exhibit 21 to Gregory C. Brown Dec.]  In March of 1991, the RWQCB issued a further letter imposing a $28,000 penalty on Arcady Oil Company.  Plaintiff DePaoli was also copied on this letter.  [Exhibit 22 to Gregory C. Brown Dec.]  During this 8 year period, Plaintiffs took no action and made no claims towards the Defendants.

**9.      1992-1993 Plaintiff's Counsel Issue Demand**

**Letters and Threaten Litigation**

Finally, Patrick D. Riddle, attorney-at-law, sent a letter dated July 13, 1992 to a number of

the Defendants in the current action.  Mr. Riddle stated that he represented Arcady Oil and that the letter "is a formal notification to you as a former generator of drilling waste deposited on the site that Arcady Oil has a possible claim against you for alleged contamination resulting from your activities."  [Exhibit 23 to Gregory C. Brown Dec.; Exhibit 1 to Patricia L. Bonyeho Dec.]

On September 30, 1993, Mr. Riddle's office sent a subsequent demand a letter to most of the current Defendants.  This time the letter was signed by David Isola and the firm now indicated that it was representing Plaintiff DePaoli rather than Arcady Oil Company.  The letter included a draft complaint and stated that the complaint would be filed "no later than forty-five (45) days from the date of this correspondence if Mr. DePaoli does not receive firm commitments from the recipients of this letter that financial assistance will be provided toward bringing the contamination problem to closure."  [Declaration of Patricia L. Bonyeho, Exhibit 2.]  No complaint was filed by Mr. DePaoli on or before November 14, 1993.

**10.      1996 – The Present Action is Filed; Pleading Proceeds through 1998**

On August 14, 1996 – 12 years after the DePaoli Site was shut down -  the present action was filed on behalf of Plaintiff DePaoli by David R. Isola.  Numerous counterclaims were filed by the Defendants.  A First Amended Complaint was filed by the Plaintiffs on January 7, 1997 with additional parties named.  The case remained somewhat active from 1997 through the end of 1999.  The parties jointly undertook limited site characterization work during 1999 and into 2000 to investigate possible cleanup alternatives in place of litigation.  When the joint funds were used up, the work stopped.  No joint work has been undertaken at the site since 2000.

**11.      Since 2000 – The Case Has Been Dormant**

Except for two notices of firm name changes, there were no pleadings filed in this case after the notice of settlement conference in 1998, and all of 1999 and 2000.  On April 12, 2001, Defendant Pacific Gas & Electric filed a Notice of Filing a Voluntary Petition under Chapter 11/Bankruptcy and Imposition of Automatic Stay.  This Court issued a notice that the case was administratively closed as of May 4, 2001.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**12.     Plaintiffs Take No Action in the PG&E Bankruptcy**

The Plaintiffs were listed on the debtor's schedules as potential creditors in the PG&E bankruptcy proceedings and were sent claim forms.  The Plaintiffs failed to file any claim in the PG&E bankruptcy.  Nor did the Plaintiffs seek to have the bankruptcy court lift the automatic bankruptcy stay with respect to this action.  Several other parties sought such relief which was granted by the Bankruptcy Court. [Declaration of Beatrice Heise, page 1, line 27 – page 3, line 17.]  [Declaration of Anton H. Hadjivassiliou, page 1, line 27 – page 2, line 5.]  The case remained dormant for several more years during this bankruptcy action.

**13.     Plaintiffs Delay Their Request to Reopen This Action**

By Plaintiff's counsel's own admission, the automatic stay in the PG&E bankruptcy case terminated on April 12, 2004, the effective date of the Plan of Reorganization.  Nevertheless, the Plaintiffs waited more than two years after that termination to seek to have this Court reopen the present case.  The delays in the prosecution of this case have been numerous and substantial. They have caused serious harm to the Defendants.

**14.     Deaths, Dissolutions, Retirements, Layoffs and**

**Other Significant Prejudice to Defendants**

The disposal of drilling mud at the DePaoli Site raised by the Complaint in this case occurred 23 years ago.  The Plaintiffs waited 12 years from the last disposal until they first filed this action.  There was activity in the case for a brief period of time in the late 1990's.  The case has been dormant since - for the last six years.

A number of crucial witnesses have died during the 23 years of inaction.  The DePaoli Site was operated by Arcady Oil Company.  Arcady Oil Company is now a defunct entity and is a suspended California corporation.  Its last agent for service of process as set forth on the California Secretary of State's web site was Alex J. Diepenbrock of South Pasadena, California. [Exhibit 26 to Gregory C. Brown Dec.]  Mr. Diepenbrock was the principle of Arcady Oil Company and is the primary author of virtually all of the correspondence from Arcady Oil

- 8 -

Company to the RWQCB.  According to a search of online death records, Mr. Diepenbrock died on February 27, 1996. [Exhibit 24 to Gregory C. Brown Dec.] This was approximately six months before the Plaintiffs filed the initial complaint in this case, 12 years after the last disposal complained of.  Clearly, his knowledge of the operation of the DePaoli Site would have been helpful in confirming that the Defendants' contribution to the DePaoli Site was not hazardous and that significant hazardous material had previously been dumped at the site by other parties.

The Plaintiff, Mr. DePaoli, was the owner of the DePaoli Site portion of the DePaoli Site beginning in 1979.  As demonstrated by the correspondence with the RWQCB, Mr. DePaoli was very active in the operation and development of the site.  As the landlord of the site, he was obtaining direct financial benefit from the disposal of drilling mud as it was he who, as shown above, was encouraging the dumping in order to reclaim the property for future use as a trailer park.  According to online death records, Mr. DePaoli died on July 5, 1999. [Exhibit 25 to Gregory C. Brown Dec.] Mr. DePaoli is a key witness who is no longer available to the Defendants.

Numerous key witnesses for the Defendants have also died during the 23 years since the last alleged disposal occurred.  Western Continental Operating Company is one of the Defendants here.  That company was essentially a "one-man show" where one individual made all of the key decisions and held much of the details of operations within his personal knowledge.  That one man, George LaPerle, died in December 2000.  The new owners of Western Continental Operating Company have no way of providing testimony concerning the makeup of drilling mud utilized in wells drilled 23 years ago by Mr. LaPerle. [Gregory C. Brown Dec., p. 5, lns. 7-15.]

Atlantic Oil Company, another Defendant, was also owned and managed by essentially a single person, Chester "Chet" Dolley.  Mr. Dolley died on April 1, 1988.  There is no one currently at Atlantic Oil Company who has knowledge of the details of drilling mud and cuttings produced or delivered from Atlantic Oil Company wells 23 years ago. [Gregory C. Brown Dec., p. 5, lns. 16-21.]

CMS Nomeco Oil and Gas Company was named as a Defendant here.  That company

1  ceased active operations in California in 1987 and has had no presence here at all since 1989.

2  The company itself was sold to a French company in September, 2002.  There are no employees

3  left at the parent company with any knowledge of the operations at issue here and a significant

4  amount of any possibly relevant documents have become unavailable over the years.  Those few

5  persons who had any contact with California who still work for the parent have been interviewed

6  and do not have a sufficient recollection of operations from nearly 25 years ago to aid in the

7  defense.  [Declaration of Ann E. Kitzmiller, page 2, lines 1-27.]

8          Hexadyne Drilling Corporation and Hexadyne Energy Corporation are also Defendants.

9  Hexadyne Drilling Corporation was a subsidiary of Hexadyne Energy Corporation until 2003.  In

10  2003, all of the assets of Hexadyne Drilling Corporation were sold, the affairs of the corporation

11  were wound up and the corporation was dissolved in 2004.  None of the employees of Hexadyne

12  Drilling Corporation remain and Hexadyne Energy Corporation conducts a different type of

13  operation than its former subsidiary.  Similarly, any documents formerly maintained by Hexadyne

14  Drilling Corporation are gone.  Since the drilling mud complained of here was disposed of by

15  Hexadyne Drilling Company, the remaining parent company has no witnesses or documents

16  remaining with which to defend itself.  [Declaration of Rob R. Rainbolt, page 1, line 24 – page 2,

17  line 15.]

18          Venturini Associates, Incorporated is another Defendant here.  Venturini Associates was a

19  small oil and gas company in northern California.  Sergio Venturini was the person who ran the

20  company.  It had no employees.  The only other shareholders were his wife and daughter.  The

21  company stopped operations in 1995, upon Mr. Venturini's retirement.  Mr. Venturini died in

22  2001.  Venturini Associates was dissolved in 2004, after having been inactive for 9 years.  There

23  is no one left who can provide evidence about alleged actions of the company 23 years ago.

24  [Declaration of James C. Glassford, p. 1, line 25-p. 2, line 20.]

25          Many companies have no employees left who have even remote or indirect knowledge of

26  any events related to this site.  So much time has passed that they are unable to find any related

27  employee or document.  Clearly the only method any Defendant has to defend itself in a case like

28

- 10 -

1  this is to affirmatively show that the material it contributed to the site was clean and permitted

2  under the Class III permit held by this site.  But now with the passage of more than 20 years, the

3  witnesses and documents which would allow them to do this are gone.

### III.

### ARGUMENT

A.    **Plaintiffs' Claims Must Be Dismissed For Failure To Prosecute.**

Pursuant to Federal Rule of Civil Procedure 41(b), the Court may dismiss an

action for a plaintiff's failure to prosecute. Fed. R. Civ. P. 41(b); *In re Eisen v. Moneymaker*, 31

F.3d 1447, 1451 (9th Cir. 1994).  In making its determination, courts weigh the following factors:

1) the public's interest in expeditious resolution of litigation; 2) the court's need to manage its

docket; 3) the risk of prejudice to defendants; 4) the availability of less drastic alternatives; and 5)

the public policy favoring disposition of cases on their merits.  *Pagtalunan v. Galaza*, 291 F.3d

639, 642 (9th Cir. 2002).  These factors weigh heavily in favor of dismissing this case for failure

to prosecute.

1.    **The public's interest in expeditious resolution of litigation weighs in favor of dismissal.**

The public's interest in expeditious resolution of litigation always favors dismissal.

*Pagtalunan*, 291 F.3d at 642 (quoting *Yourish v. California Amplifier*, 191 F.3d 983, 990 (9th Cir.

1999)).  Thus, given Plaintiffs' failure to pursue this case for at least five years, this factor weighs

in favor of dismissal.  *See id.* (holding that plaintiff's failure to pursue his case for *four months*

weighed in favor dismissal).

2.    **The Court's docket has been negatively affected by Plaintiffs' inaction.**

Plaintiffs have negatively impacted the Court's docket by allowing this case to

stagnate for years.  Dismissal is appropriate to avoid "undue delays in the disposition of pending

cases" and congestion in the district court's calendar.  *Link v. Wabash Railroad Co.*, 370 U.S.

626, 629-30 (1962); *see also Zaldivar v. Adams*, 2005 U.S. Dist. LEXIS 25692, at *2 (E.D. Cal.

Oct. 27, 2005) (recommending dismissal of plaintiff's case in part because the court has an

1   interest in managing its docket and cannot hold cases in abeyance indefinitely).  The Ninth

2   Circuit held in *In re Eisen* that a bankruptcy's court's desire to settle a nine-year-old bankruptcy

3   case that had been unreasonably delayed for four years warranted dismissal.  31 F.3d at 1452; *see*

4   *also Link*, 370 U.S. at 633, 633 n.9 (stating that plaintiff's case was the oldest case on the district

5   court's docket, and that the district court did not abuse its discretion in dismissing the case to

6   manage its docket).  Likewise, Plaintiffs' case has been on the Court's docket since Plaintiffs

7   filed their first complaint on August 14, 1996.  Plaintiffs have allowed the case to lie nearly

8   dormant for the better part of the past ten years.  Because the Court's docket has been hampered

9   for years longer than necessary, this factor also weighs heavily in favor of dismissal.

10          **3.      Defendants have been prejudiced by Plaintiffs' failure to prosecute.**

11          Most significantly, Defendants have been substantially prejudiced by Plaintiffs'

12  failure to diligently prosecute this case.  Unreasonable delay creates a presumption of prejudice to

13  the defendants.  *Morris v. Morgan Stanley & Co*., 942 F.2d 648, 652 (9th Cir. 1991); *States*

14  *Steamship Co. v. Philippine Air Lines*, 426 F.2d 803, 804 (9th Cir. 1970).  In this case, Plaintiffs'

15  delay was unreasonable and unexplained.

16          Courts have held that months, or even weeks, of delay on the part of the plaintiff

17  are unreasonable.  *See, e.g., Pagatalunan*, 291 F.3d at 642 (finding that plaintiff's failure to

18  pursue the case for four months weighed in favor of dismissal); *Ash v. Cvetkov*, 739 F.2d 493, 496

19  (9th Cir. 1984) (dismissing plaintiff's case for failure to prosecute where plaintiffs neglected the

20  case for four weeks); *Pringle v. Blalock*, 2005 U.S. Dist. LEXIS 31325, at *1-2 (E.D. Cal. Dec. 4,

21  2005) (dismissing plaintiff's complaint for failure to prosecute when plaintiff failed to respond to

22  an order to show cause for nearly sixty days).  In this case, Plaintiffs delayed without explanation

23  for years.  *See Link*, 370 U.S. 626, 629, 629 n.2 (1962) (finding that trial court did not abuse its

24  discretion in dismissing plaintiff's case after delay of several years); *In re Eisen*, 31 F.3d at 1456

25  (holding that bankruptcy court did not abuse its discretion in granting motion to dismiss for where

26  plaintiff delayed for four years).  Therefore, the delay was unreasonable.

27          **a.      Plaintiffs cannot rebut the presumption of prejudice.**

28          While the presumption of prejudice is rebuttable, Plaintiffs have no explanation for

their delays in prosecuting this case.  *See In re Eisen*, 31 F.3d at 1452 (stating that presumption of prejudice is rebuttable and holding that plaintiff's excuse did not render the prejudice "illusory or relatively insignificant").  Indeed, Plaintiffs had the opportunity to move the case along in 2001, even though defendant PG&E entered bankruptcy.  By Plaintiffs' own admission, PG&E was allegedly responsible for merely 0.16% of the contribution of alleged contamination to the Site.  (*See* First Amended Compl. at Exhibit B, p. 2).  Plaintiffs could have moved for relief from the Automatic Stay, but did not do so.[1] (Declaration of Anton Hadjivassiliou, ¶¶ 2-3.)  Moreover, the case could have been resolved without PG&E's involvement as it is arguable that, with such a miniscule potential liability, PG&E was not a necessary party in this action.  Plaintiffs could have dismissed PG&E, and proceeded with the case with the remaining defendants.  Significantly, the bankruptcy court handling PG&E's reorganization ruled that PG&E could continue to fund and pursue its hazardous waste cleanup programs regardless of the bankruptcy proceedings.  *In re Pacific Gas & Electric, Co*., No. 01-30923 (N.D. Cal. June 26, 2001) (order granting Debtor's Motion for Authority to Continue its Hazardous Substances Cleanup Programs).  Furthermore, Plaintiffs never filed a proof of claim from in the PG&E bankruptcy.  (Declaration of Beatrice A. Heise, ¶ 5, 6.)  Regardless, even after the automatic bankruptcy stay was lifted, Plaintiffs still waited two years to file a request to re-open this action.  Thus, Plaintiffs cannot rebut the presumption of prejudice to Defendants.

---

[1] A party in interest can request relief from the Automatic Stay under Bankruptcy Code section 362(d) for cause shown.  *See* 11 U.S.C. § 362(d) (stating that a bankruptcy court shall grant relief from stay for cause).  Whether cause exists to lift the automatic stay is left to the sound discretion of the bankruptcy court.  *In re Kissinger*, 72 F.3d 107, 108-09 (9th Cir. 1995).  To allow an action to proceed to completion in another tribunal is cause for relief from an automatic stay.  *In re Universal Life Church, Inc*., 127 B.R. 453, 455 (E.D. Cal. 1991) (citing legislative history).  Judicial economy alone may also justify lifting the stay.  *In re Brass Corp*., 176 B.R. 11, 13 (Bankr. E.D. Tex 1994) (holding that lifting the stay would allow the appellate court to decide an important issue that would affect the outcome of future, related litigation, and the state supreme court, rather than the bankruptcy court, was in the best position to decide the issue).  Had the Plaintiffs requested relief from stay, judicial economy would have weighed heavily in favor of such relief.  The district court is the proper court to hear these claims, and the bankruptcy court's expertise was not necessary.  *See In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992) (stating that whether the bankruptcy court's expertise is needed to determine the claims at issue weighs heavily in terms of judicial economy).

**b.      Defendants have suffered actual prejudice because key evidence and witnesses are no longer available.**

Even if Plaintiffs offered some excuse for their delay, Defendants have suffered such substantial and actual prejudice through loss of evidence and loss of memory by witnesses as to render any excuse insignificant.  *Nealy v. Transportacion Maritima Mexicana, S.A.*, 662 F.2d 1275, 1281 (9th Cir. 1980) (stating that if plaintiff comes forth with an excuse that is not insignificant, Defendants can come forth with actual prejudice to show that the proffered excuse is relatively insignificant).

Actual prejudice arises from either loss of evidence or loss of memory by witnesses.  *In re Eisen*, 31 F.3d at 1453 (stating that loss of witnesses and evidence constitute prejudice, and that the prejudice is significant if plaintiff's action impaired the defendant's ability to go to trial or threatened the rightful decision of the case); *Nealy*, 662 F.2d at 1281 (finding that when such losses are significant, such as an irretrievable loss of evidence, the case is subject to dismissal).  Defendants have suffered both, and to such a degree that litigation on the merits would be tainted and nearly impossible.

After five years of inaction, the witnesses and evidence that Defendants would need to support their defenses are no longer available.  *See Pagtalunan*, 291 F.3d at 643 (stating that unnecessary delay inherently increases the risk that witnesses' memories will fade and evidence will become stale).  Many defendant corporations have changed hands, become insolvent, or have merged with other corporations.  *See* Declaration of Ann E. Kitzmiller ("Kitzmiller Decl." ¶ 4; Glassford Decl. ¶ 10; Cleveland Decl. ¶ 4.)  Many of the people who would have been involved when this case was closed in 2001 are no longer employed by individual defendants, or have passed away.  (Kitzmiller Decl. ¶ 2; Stephens Decl. ¶ 8; Glassford Decl. ¶ 8, 12, 13; McMillan Decl. ¶ 4; Cleveland Decl. ¶ 8, 10.)  Even Plaintiff DePaoli has passed away in the interim.  The people and the records needed to defend this matter simply no longer exist.  (Kitzmiller Decl. ¶ 2, 5; Stephens Decl. ¶ 5, 8; Glassford Decl. ¶ 13; Cleveland Decl. ¶ 10.)

Furthermore, because the Site is open and presumably unmonitored, the

- 14 -

1   constitution of the Site could have changed over the last several years.  Since the defendants

2   began the assessment of the Site prior to the case's closure, inclement weather, other sources of

3   dumping, or other factors beyond Defendants' control could have affected the Site, making any

4   determination of liability a broad estimation at best.  During the past five years of inexplicable

5   delay, it has become more difficult to determine whose involvement is responsible for the alleged

6   contamination. The non-participation of parties who either were Defendants, but now are in

7   bankruptcy, or who could have potentially been Defendants, but are now unavailable greatly

8   prejudices Defendants in two primary ways.  First, these absent potential Defendants increase

9   each Defendant's potential exposure.  Second, current Defendants' abilities to determine the

10   actual responsible parties and assert defenses that place liability with those absent parties are

11   eliminated.

12        The actual harm suffered by Defendants weighs heavily in favor of dismissing

13   Plaintiffs' complaint due to failure to prosecute.  This case is a prime example of the harm that

14   can occur when a plaintiff neglects his case.

15        **4.    No less drastic alternatives are available.**

16        Due to Plaintiffs' delay in prosecuting this case, no less drastic alternatives are

17   available.  Evidence and witnesses are simply no longer available.  (Kitzmiller Decl. ¶ 2, 5;

18   Glassford Decl. ¶ 13; McMillan Decl. ¶ 4.)  Lesser sanctions would not bring back a deceased or

19   missing witness' memory, and thus will not cure Plaintiffs' delay.  *In re Eisen*, 31 F.3d at 1455.

20   Consequently, this factor also weighs in favor of dismissal.  *Id.*

21        **5.    Public policy favoring disposition of cases on their merits does not**
          **outweigh dismissal in this instance.**
22

23        Although public policy favors disposition on the merits, "it is the responsibility of

24   the moving party to move towards that disposition at a reasonable pace. . .."  *Morris*, 942 F.2d at

25   652.  Plaintiffs have done nothing to move this case forward of their own accord.  Instead, they

26   have allowed years to pass wherein they made no move to show that they had any interest in this

27   case at all.

28        To allow this case to proceed after Plaintiffs allowed it to sit stagnant for over five

1   years would condone the practice of taking advantage of district courts and their already over-

2   burdened case load.  Thus, courts hold that where other factors weigh in favor of dismissing an

3   action for failure to prosecute, this factor is outweighed.  *See Pagtalunan*, 291 F.3d at 643

4   (finding that even though public policy favors disposing of cases on their merits, because three

5   factors weighed heavily in favor of dismissal, the district court did not abuse its discretion in

6   dismissing the case); *Martinez v. Whitman*, 2005 U.S. Dist. LEXIS 34133, at *3 (E.D. Cal. Dec.

7   20, 2005) (finding that while public policy does favor disposition of cases on their merits, the

8   policy is greatly outweighed by prejudice due to delay, and dismissing the case); *Zaldivar*, 2005

9   U.S. Dist. LEXIS 25692, at *2-3 (same).

10          **B.      Plaintiffs' Claims Are Barred By The Doctrine Of Laches.**

11          Plaintiffs' delay in prosecution is particularly egregious when coupled with their

12   delay in initiating this action.  *Nealy*, 662 F.2d at 1280 n.6.  The test for laches is similar to the

13   test for failure to prosecute, except it focuses on the time lapsed before the initiation of the

14   lawsuit, rather than after.  The factors are:  (1) lack of diligence by the plaintiff and (2) prejudice

15   to the defendant.

16          Plaintiffs failed to exercise diligence in waiting more than a decade to bring their

17   initial action.  Some courts invoke the doctrine of laches "sparingly in environmental cases

18   because ordinarily the plaintiff will not be the only victim of the alleged environmental damages."

19   *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 854 (9th Cir. 1982).  In this case, however,

20   there is no overriding public interest in the Site.  Indeed, the factors for determining whether the

21   plaintiff exercised diligence in an environmental case seem to contemplate a citizen suit against

22   the government:  (1) whether the plaintiff attempted to communicate its position to the agency

23   before filing suit; (2) the agency's response; and (3) the extent of actions, such as preparatory

24   construction, that would have motivated the citizens to investigate legal bases for challenging the

25   agency action.  *Id*. at 854.  In actions where these factors do not cleanly fit, courts have focused

26   on when the plaintiff actually became aware of its cause of action.  *Id*. at 854-55.  In this case,

27   Plaintiffs were apparently aware of their causes of action more than a decade before they

28   commenced their action.  Additionally, as discussed previously, Defendants in this case have

1    suffered substantial prejudice.  Evidence and witnesses are simply no longer available.

2    (Kitzmiller Decl. ¶ 2, 5.)  Even applying laches sparingly to environmental cases, this case is

3    barred by the doctrine.

4            The following declarations are submitted in support of Defendants' motion to

5    dismiss:  Patricia L. Bonheyo, Ira C. Cleveland, James C. Glassford, Anton H. Hadjivassiliou,

6    Beatrice A. Heise, Ann E. Kitzmiller, Boyd McMillan, Erica L. Rosasco, Andrew M. Stephens

7    and Gregory C. Brown.

8                                          **IV.**

9                                     **CONCLUSION**

10           For all the foregoing reasons, the moving Defendants Hess Corporation (formerly

11   Amereda Hess Corporation), ASTA Construction Co., Inc., Delta Oilfield Services, Inc., OXY

12   USA Inc., Hexadyne Energy Corporation, Hamilton Brothers Corporation, Occidental Petroleum

13   Corporation, Western Continental Operating Company, Venturini Associates, Incorporated,

14   Atlantic Richfield Company (formerly Arco Oil and Gas Company), CMS Nomeco Oil & Gas

15   Co.,  BP America Production Company (formerly Amoco Production Company and erroneously

16   sued as Amoco Petroleum Additives Co.), Atlantic Oil Company, Castle Minerals, Chevron

17   U.S.A., Cleveland Drilling, Inc., ConocoPhillips Company, successor by merger to Conoco, Inc.,

18   and sued as Conoco, Inc.,  Inc., Hexadyne Drilling Corporation, Pacific Gas & Electric Company,

19   EnCana Corporation (formerly Pan Canadian Petroleum Company), A.M. Stephens Construction

20   Co., Inc.,  Marathon Oil Company (formerly Texas Oil & Gas Corporation.), and Union Oil

21   Company of California doing business as Unocal, respectfully request that this Court dismiss this

22   action for failure to prosecute and as being barred by the doctrine of laches.

23

24

25

26

27

28

MOTION TO DISMISS
96 CV 1473 FCD/JFM

1    Dated:  September 26, 2006.       ORRICK, HERRINGTON & SUTCLIFFE LLP

2

3                                       By:     /s/ Norman C. Hile

4                                          NORMAN C. HILE
                                         STEPHANIE ZOOK
                                         Attorneys for Defendant

5                                          CMS Nomeco Oil & Gas Co.

6

7    Dated:  September 26, 2006.       LAW OFFICE OF LORI J. GUALCO

8

9                                         By:     /s/ Lori J. Gualco
                                         Lori J. Gualco

10                                          Attorney for Defendant
                                         ASTA Construction Co., Inc.

11

12    Dated:  September 26, 2006.       WESTON, BENSHOOF, ROCHEFORT,
                                         RUBALCAVA & MacCUISH LLP

13

14

15                                         By:     /s/ Andrew M. Gilford
                                         ANDREW M. GILFORD

16                                          Attorney for Defendant
                                   Hess Corporation  (formerly Amerada Hess

17                                    Corporation), Atlantic Richfield Corporation
                                   (formerly Arco Oil and Gas Company), and BP

18                                   America Production Company (formerly Amoco
                                  Production Company and erroneously sued as

19                                   Amoco Petroleum Additives Co.)

20

21

22

23

24

25

26

27

28

1    Dated: September 26, 2006.              LAW OFFICE OF DAVID M. YOUNG

2

3                                            By:      /s/ David M. Young

4                                                 David M. Young
                                                  Attorney for Defendant
5                                                 Delta Oilfield Services, Inc.

6
     Dated: September 26, 2006.              BARG COFFIN LEWIS & TRAPP LLP
7

8
                                             By:      /s/ Brian S. Haughton
9                                                 BRIAN S. HAUGHTON
                                                  Attorney for Defendants
10                                           OXY USA Inc., Hamilton Brothers Corporation,
                                             Occidental Petroleum Corporation and Pacific Gas
11                                                & Electric Co.

12
     Dated: September 26, 2006.              THE COSTA LAW FIRM
13

14
                                             By:      /s/ Daniel P. Costa
15                                                 DANIEL P. COSTA
                                                   ERICA L. ROSASCO
16                                                 Attorneys for Defendants
                                             Hexadyne Energy Corporation and Hexadyne
17                                                  Drilling Corporation

18
     Dated: September 26, 2006.              BRIGHT & BROWN
19

20
                                             By:      /s/ Gregory C. Brown
21                                                 GREGORY C. BROWN
                                                   Attorney for Defendants
22                                           Western Continental Operating Co., Atlantic Oil
                                             Company, Chevron USA Inc., EnCana Corp.
23                                           (formerly Pan Canadian Petroleum Company),
                                             Marathon Oil Co. (formerly Texas Oil & Gas
24                                           Corp.), Union Oil Company of California, doing
                                             business as Unocal and Western Continental
25                                                  Operating Co.

26

27

28

                                    - 19 -                    MOTION TO DISMISS
                                                             96 CV 1473 FCD/JFM

1    Dated:  September 26, 2006.                  BURNHAM BROWN

2

3                                                By:      /s/ John J. Verber
                                                 _____
4                                                        JOHN J. VERBER
                                                     Attorney for Defendant
5                                                    Venturini Associates, Inc.

6
     Dated:  September 26, 2006.                  CASTLE MINERALS
7

8
                                                 By:      /s/ Jeff E. Stiles
9                                                _____
                                                        JEFF E. STILES
10                                                   In propria persona
                                                        Castle Minerals
11
     Dated:  September 26, 2006.                  NORIEGA & BRADSHAW, LLP
12

13
                                                 By:      /s/ Robert J. Noriega
14                                               _____
                                                     ROBERT J. NORIEGA
15                                                   Attorney for Defendant
                                                     Cleveland Drilling, Inc.
16
     Dated:  September 26, 2006.                  GLYNN & FINLEY, LLP
17

18
                                                 By:      /s/ Patricia Bonheyo
19                                               _____
                                                       ANDREW MORTL
20                                                  PATRICIA L. BONHEYO
                                                    Attorneys for Defendant
21                                ConocoPhillips Company, successor by merger to
                                   Conoco, Inc., and sued as Conoco, Inc.
22

23

24

25

26

27

28

MOTION TO DISMISS
                                                 96 CV 1473 FCD/JFM

1 | Dated: September 26, 2006.

KROLOFF, BELCHER, SMART, PERRY & CHRISTOPHERSON


By:     /s/ Kathleen M. Abdallah
KATHLEEN M. ABDALLAH
Attorneys for Defendant
A.M. Stephens Construction Co., Inc.

- 21 -